FILED
2011 Jan-04  PM 02:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| BRANCH BANKING AND TRUST COMPANY, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant | ) | |
| | ) | |
| v. | ) | 2:10-cv-0301-PWG |
| | ) | |
| MICHAEL McCLURE and SANDRA McCLURE, | ) | |
| | ) | |
| Defendants/Counterclaim Plaintiffs | ) | |

## MEMORANDUM OPINION

In this action, Branch Banking and Trust ("BB&T"), seeks to recover under Alabama law on a promissory note upon which the defendants, Michael and Sandra McClure (the "McClures") have allegedly defaulted.  The McClures have filed an answer denying liability and asserted counterclaims and a right of setoff based upon alleged wrongdoing by the original lender, Colonial Bank, N.A. ("Colonial"), a non-party to this action.   The parties have consented to the exercise of plenary jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Rule 73, Fed. R. Civ. P.  (Doc. 12).  The action is now before the court on a motion filed by BB&T pursuant to Rule 12(b)(6), Fed. R. Civ. P., seeking dismissal of the McClures' counterclaims.  (Doc. 14).  The parties have fully briefed the motion, which is now ripe for decision.  Upon consideration, the court concludes that BB&T's motion to dismiss the counterclaim is due to be GRANTED.

## I.      REVIEW STANDARDS

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a motion to dismiss all or some of the claims in a complaint or in a counterclaim on the ground that its allegations fail to state a claim upon which relief can be granted.  The purpose of such a motion is to test the facial

sufficiency of the statement of claim for relief. *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1367 (11th Cir. 1997).  Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  The court assumes the factual allegations of the claimant's pleading are true and gives the claimant the benefit of all reasonable factual inferences. *Hazewood v. Foundation Financial Group, LLC*, 551 F.3d 1223, 1224 (11th Cir. 2008) (per curiam).  However, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see also Ashcroft v. Iqbal*, 556 U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").  Nor is it proper to assume that the plaintiff can prove facts it has not alleged or that the defendants have violated the law in ways that have not been alleged.  *Twombly*, 550 U.S. at 563 n.8 (citing *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 526 (1983)).

## II.   BACKGROUND[1]

On or about January 24, 2006, the McClures signed a promissory note (the "Note") to Colonial Bank, N.A. ("Colonial Bank"), pursuant to which Colonial Bank loaned the McClures the

---

[1] The court's account of background information is predicated on the complaint (Doc. 1) and the McClures' answer and counterclaim (Doc. 5). When the pleadings conflict, the court will credit the McClures' allegations over those of BB&T and draw reasonable inferences in the McClures' favor as the non-movants. Accordingly, the background facts set forth herein are the "facts" for purposes of the instant motion only; they may not be the actual facts.  It should also be noted that the McClures have disputed the propriety of the court's consideration at the Rule 12(b)(6) stage of certain documents that BB&T has appended to its motion to dismiss. That issue is addressed below.

principal amount of $3.6 million for the purpose of purchasing a Cessna Citation airplane.  (Doc. 1 ("Complaint" or "Compl."), ¶ 7).  The financial condition of Colonial Bank became unstable, and on August 14, 2009, the Federal Deposit Insurance Corporation was appointed as the receiver for Colonial Bank.  (Compl. ¶ 1); *see also generally Bank of Amer. Nat. Ass'n v. Colonial Bank*, 604 F.3d 1239 (11th Cir. 2010).  On that same date, the FDIC entered into a purchase and assumption agreement with Plaintiff BB&T pursuant to which, among other things, BB&T purchased various assets of Colonial Bank, including the loan made by Colonial Bank to the McClures, as well as the loan documents memorializing that transaction.     (Compl. ¶ 1);  *see also* www.fdic/gov/bank/indivual/failed/colonial-al_P_and_A.pdf.   BB&T is thus the current holder of the Note and associated loan documents.  (Id., ¶ 8).

On February 8, 2010, BB&T filed this action, asserting that it was the owner of the Note and that the McClures had defaulted by failing to pay amounts that had become due.  (Id., ¶ 9).  On account of the McClures' default, BB&T accelerated the outstanding amount owed under the terms of the Note.  (Id. ¶ 10).  BB&T maintains that, as a result, the McClures are liable under Alabama law for breach of contract and unjust enrichment.  BB&T contends that, as of January 28, 2010, the McClures' liability on the Note consisted of $1,248,657.08 in principal, $50,487.57 in accrued interest, and $600.00 in late fees, with additional interest accruing at the Note's default rate of 8.9%. (Id. ¶¶ 10, 12).

The McClures thereafter filed a consolidated responsive pleading captioned "Defendants' Answer and Counterclaim." (Doc. 5 ("Counterclaim" or "Countercl.").  While admitting that they had executed the Note, the McClures denied being indebted or otherwise liable to BB&T.  (Id. ¶ 4). The McClures contend that they have the right, assuming BB&T is entitled to enforce the Note, "to

assert the affirmative defenses, claims, counterclaims, and rights to set offs that they would have if the [N]ote were being enforced by [Colonial Bank]."  (Id. ¶ 6).  All such asserted "defenses," rights of "setoff," and "counterclaims" are based on the same allegations of wrongdoing on the part of a "Colonial Bank" corporate entity,[2] as well as its officers, directors, and/or employees.  The McClures also contend that prior to BB&T's acquisition of the Note from the FDIC, BB&T "knew or should have known of some if not all of [the McClures'] disputes and claims were due to be asserted."  (Id. ¶ 13).  On their counterclaims, the McClures demand compensatory and punitive damages only "in an amount sufficient to offset [BB&T's] claims against the [McClures]."  (Id. at p. 6, Ad Damnum Clause following ¶ 31).

The McClures claim a setoff and the counterclaims relate in one way or another to shares of stock they owned in Colonial Bank's parent corporation, Colonial BancGroup, Inc.[3] ("CBG").  (See id. ¶¶ 4, 9(b), 11, 23).  In their capacity as shareholders, the McClures assert counterclaims alleging that Colonial Bank engaged in tortuous mismanagement of its business so as to cause the company to become insolvent and its stock worthless, including a failure to maintain sufficient loan reserves, loaning excessive amounts in the Florida real estate development and construction market, overstating the value of its good will on its financial statements, and by failing to keep proper records of the loan portfolio.  (Counterclaim ¶ 18).  The McClures further contend that Colonial Bank, its

---

[2]    The Counterclaim initially refers to the entity that made the subject loan to the McClures as "Colonial Bank" and thereafter simply as "the bank." (Counterclaim ¶ 4).  While the Counterclaim does not use the entity's correct legal name, the complaint and the loan documents attached to the parties respective pleadings show that Colonial Bank, N.A., made that loan.

[3]    Strictly speaking, the Counterclaim itself does not identify what particular "Colonial" entity was associated with the shares of stock owned by the McClures.  Rather, it indicates that they owned shares of "the bank," implying "Colonial Bank, N.A.," the entity that made the loan to the McClures.  (Countercl. ¶¶ 4, 9, 23).  Nonetheless, both BB&T and the McClures have acknowledged in their briefs that the shares in question were actually of Colonial Bank, N.A.'s parent, CBG.  (BB&T Brief at 2; McClures Opp. at 3).  In any event, it does not appear that any distinction in this regard is material to the outcome of BB&T's motion to dismiss.

4

officers, directors, and employees fraudulently misrepresented and suppressed material facts regarding Colonial Bank's financial condition and its operations, including by "manipulating [Colonial's] book and records," by issuing false reports to the effect that it was going to engage in transactions to restore the institution's financial health, and by making false statements that Colonial Bank "was to get TARP money, a capital infusion from investors, and/or be sold to a third party." (Id. ¶ 18-21). Such fraud, the McClures claim, caused them to retain their stock instead of selling it, resulting in pecuniary loss that purportedly exceeds the sums that BB&T is seeking to recover on the Note. (Id. ¶¶ 21-22)[4].

The McClures also assert a counterclaim against BB&T relative to their position as borrowers. Contemporaneously with their execution of the Note, the McClures signed a number of other agreements, including a Securities Pledge Agreement. (Doc. 5-4 ("Pledge Agreement")), Exhibit 3 to Defendants' Answer and Counterclaim, Doc. 5 ("Counterclaim"); Answ. ¶ 7). Pursuant to the Pledge Agreement, the McClures agreed to pledge, among other things, a certain investment account containing stocks as collateral in order to secure payment of any outstanding indebtedness related to the Note. (Pledge Agreement § 1). Included in the Pledged Collateral was the McClures' shares of stock in CBG. The McClures claim that Colonial Bank thus "held" such stock, and as a result, Colonial allegedly assumed a fiduciary or other legal "duty to preserve the value of the collateral." (Id. ¶ 23). Colonial breached such duty, the McClures claim, by failing to sell the stock before its price fell further. (Id.)

---

[4]    The McClures suggest in their opposition brief that the value of their Colonial stock was roughly $6 million and that it is now nearly worthless.

BB&T has now filed a motion to dismiss the McClures' counterclaims pursuant to Rule 12(b)(6), Fed. R. Civ. P. (Doc. 14 ("BB&T Mot. to Dismiss")), which is accompanied by a supporting brief (Doc. 15 ("BB&T Brief")).   The McClures have filed a responsive brief in opposition to BB&T's motion (Doc. 18, ("McClure Opp.")), and BB&T has filed the final shot with its reply brief.  (Doc. 19 ("BB&T Reply")).

## III.    DISCUSSION

### A.    Duty to "Preserve the Value" of the McClures' Pledged Colonial Stock

BB&T first contends that it is entitled to a dismissal of the McClures' counterclaim based upon a breach of an alleged fiduciary duty on the part of Colonial Bank to "preserve the value" of the CBG stock that the McClures pledged as collateral to Colonial Bank pursuant to the Pledge Agreement. (Counterclaim ¶ 23).  The McClures have claimed Colonial Bank would have satisfied that duty only if it sold the pledged stock before its value further declined.  (Id.)  BB&T is willing to assume, for argument's sake, that it took the Note subject to the defenses, counterclaims, and setoffs that the McClures might have asserted against Colonial Bank, as the McClures have argued. BB&T urges, however, that the language of the Pledge Agreement and the law itself preclude the viability of such a claim against Colonial Bank, so the McClures can fare no better against BB&T. The court agrees.

The Pledge Agreement provides that the terms are governed by Alabama law.  The McClures pledged a designated investment account and its contents, which included shares of CBG stock, to Colonial Bank as collateral for the loan.  (Pledge Agreement §§  1, 14).  It further provided that the McClures were to deliver duly executed stock powers in blank and such other instruments or documents as Colonial Bank may reasonably request  and that Colonial Bank had the option to have

6

all pledged securities registered in its name.  (Id.)  The McClures further warranted that they would "make no voluntary assignment, pledge, mortgage, hypothecation, or transfer" of the pledged collateral during the term of the Pledge Agreement.  (Id. § 3). So long as they did not default on the loan, the McClures remained entitled to "exercise any and all voting and other consensual rights and powers accruing to an owner" of the pledged securities, provided that such exercise would not "have a material adverse effect" on their value or Colonial Bank's rights as pledgee.  (Id.)  Upon default, Colonial Bank was authorized "to continue to hold" the pledged collateral for its own account or dispose of it towards satisfaction of the debt.  (*See id.* §§ 6-7).  Under the Pledge Agreement, the McClures appointed Colonial Bank to act as their "attorney-in-fact" for purposes of carrying out its provisions.  (Id. § 7).  However, the Pledge Agreement further stipulated as follows:

> [N]othing herein contained shall be construed as required or obligating [Colonial Bank] to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by it, or to present or file any claim or notice, or to take any action with respect to the Pledged Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby, and no action taken by [Colonial Bank] or omitted to be taken with respect to the Pledged Collateral or any part thereof shall give rise to any defense, counterclaim or offset in favor of the [McClures] or to any claim or action against [Colonial Bank].

(Pledge Agreement § 7).

BB&T relies upon the foregoing quoted language of § 7 of the Pledge Agreement as precluding that Colonial Bank might have had a legal duty that would specifically include monitoring the value of the McClures' pledged collateral, including the CBG stock, or selling it off at a particular time in order to preserve its value.  There is nothing in the Pledge Agreement or in the other loan documents that might be interpreted to give rise to such a duty on the part of Colonial Bank.  If anything, the relevant language of the agreement would foreclose such a duty. Furthermore, as BB&T argues, numerous courts have held that a party in possession of securities

7

pledged as collateral for a debt generally has no duty to sell them in order to avoid a decrease in value. *See First United Bank & Trust Co. v. Penny*, 242 P.3d 593, 597-98 (Okla.Civ.App. 2010); *Layne v. Bank One, Ky., N.A.*, 395 F.3d 271, ___ (6th Cir. 2005); *Tepper v. Chase Manhattan Bank*, 376 So. 2d 35, 36 (Fla. App. 1979) (per curiam); *Capos v. Mid-America Nat. Bank*, 581 F.2d 676, 680 (7th Cir. 1978); *FDIC v. Air Atlantic, Inc.*, 452 N.E.2d 1143, 1147 (Mass. 1983); *Marriot Employees' Fed. Credit Union v. Harris*, 897 S.W.2d 723, 728 (Tenn. Ct. App. 1995); *see also* Restatement of Security (1941) § 18, cmt. a. ("The pledgee is not liable for a decline in the value of pledged instruments, even if timely action could have prevented such decline."); 2A Fletcher Cyc. Corp. § 5649.05 ("The pledge of stock that fluctuates in value is under no obligation to protect the pledgor in the decline in value of stock held in the pledge in the absence of instructions from the pledgor to sell the stock after the maturity of the obligation at the time when the creditor or pledgee will lose no advantage by reason of the pledge."). The McClures observe that BB&T has not cited a case in which an Alabama court has articulated such a rule. However, there is no reason to suspect that Alabama courts would implement a different rule than that set out above. *Cf. Montgomery Bank & Trust Co. v. Kelly*, 81 So. 612 (Ala. 1919) ("[I]n the absence of a special agreement a pledgee is invested with a discretion with respect to a sale of the subject of the pledge, and is not bound to sell collateral in order to avoid liability for its depreciation occurring after the maturity of the debt to secure which the property is pledged."). Nor have the McClures directed the court to authority, from Alabama or otherwise, supporting that the law imposes a general duty on a pledgee to liquidate pledged stock at a particular time in order to prevent it from further declining in value.

The McClures also contend that the instant case is materially distinguishable from the cases from other jurisdictions cited by BB&T insofar as Colonial Bank was not only a pledgee of the stock,

8

it knew or should have known that its value would drop precipitously because the stock in question

was that of Colonial Bank's parent, CBG.  The McClures ignore the fact that the entity that made

the loan to them and acted as pledgee is Colonial Bank, N.A., while the stock in question was for

a technically distinct entity, Colonial BancGroup, Inc.  Even assuming that distinction is immaterial

for instant purposes,

> the obligations of the pledgee of stock to the pledgor would not be violated by the
> pledgee if the stock held in pledge suffered a loss in value through negligence of the
> pledgee in acting as director of the company or through ill-advised or negligent
> voting of other stock owned by him. The fact that the pledgee of stock owns other
> stock in the same company, or is a director or officer therein, does not impose any
> greater duty upon him, in respect to the stock pledged, than if he had no relation to
> the company at all.

*Empire Life Ins. Co. of Amer. v. Valdak Corp.*, 468 F.2d 330, 335-36 (5th Cir. 1975) (applying Texas

law) (quoting *Ritchie v. McMullen*, 79 F. 522, 533-34 (6th Cir. 1897)).  Accordingly, the McClures'

broad allegations of negligence and mismanagement on the part of the relevant "Colonial" entity or

entities in business operations generally do not alter the analysis so as to support the existence of a

duty on the part of Colonial Bank in its capacity as pledgee to have liquidated the McClures' stock.

BB&T is entitled to summary judgment on the McClures' counterclaim founded upon the breach of

such a purported duty.

### B.     Fraud and Corporate Mismanagement

BB&T also contends that it is entitled to summary judgment on the McClures' other

counterclaims, which are based on allegations that Colonial Bank, its officers, directors, and

employees mismanaged its affairs, causing the stock to become worthless, and that such parties also

fraudulently misrepresented and suppressed material facts regarding the financial position and

prospects of the company, inducing the McClures to retain rather than sell their shares.  In support,

BB&T argues primarily that the pleadings and materials attached thereto establish that BB&T is not liable under any theory of successor liability recognized by Alabama law with respect to such alleged wrongdoing on the part of Colonial Bank. The McClures concede that they do not seek to impose affirmative liability against BB&T based upon these causes of action. That is, the McClures acknowledge that they do not seek damages; they seek only to reduce or eliminate the balance that might otherwise be owed on the Note. (*See* McClure Opp. at 4). Indeed, BB&T's focus on successor liability is misdirected in that the Counterclaim does not allege facts suggesting, or even assert in a conclusory fashion, that BB&T might be held liable generally as a successor corporation for the debts or wrongdoing of Colonial Bank. The McClures insist that their counterclaims are authorized solely on the basis that BB&T brings the current suit as Colonial Bank's assignee on the Note and that, as obligors thereupon, they are entitled to assert any defense, counterclaim, or setoff against BB&T that they could have asserted if Colonial had retained the Note and brought suit.

In support of their theory, the McClures first rely upon Ala. Code § 7-3-305 (1975). That statute provides in relevant part as follows:

> (a) Except as stated in subsection (b), the right to enforce the obligation of a party to pay an instrument is subject to the following:
>
>> (1) A defense of the obligor based on (i) infancy of the obligor to the extent it is a defense to a simple contract, (ii) duress, lack of legal capacity, or illegality of the transaction which, under other law, nullifies the obligation of the obligor, (iii) fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms, or (iv) discharge of the obligor in insolvency proceedings;
>
>> (2) A defense of the obligor stated in another section of this article or a defense of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract; and
>
>> (3) A claim in recoupment of the obligor against the original payee of the instrument if the claim arose from the transaction that gave rise to the

instrument; but the claim of the obligor may be asserted against a transferee of the instrument only to reduce the amount owing on the instrument at the time the action is brought.

(b) The right of a holder in due course to enforce the obligation of a party to pay the instrument is subject to defenses of the obligor stated in subsection (a) (1), but is not subject to defenses of the obligor stated in subsection (a) (2) or claims in recoupment stated in subsection (a) (3) against a person other than the holder.

Ala. Code §§ 7-3-305(a), (b).

BB&T does not dispute that the promissory note executed by the McClures that BB&T seeks to enforce is a negotiable instrument and is thus covered by § 7-3-305.  *See* Ala. Code §§ 7-3-102, 7-3-104; *see also generally Foster v. Hacienda Nirvana, Inc.*, 32 So. 3d 1256, 1264 (Ala. 2009).  However, the approach taken by Ala. Code §§ 7-3-305(a)(3) and (b) is that a transferee, even one who is not a holder in due course, is subject only to a debt or other claims that the obligor had against the original payee of the instrument to the extent that such claims arose in the transaction that gave rise to the note.  Ala. Code § 7-3-305, Official Comment ¶ 3.  This is so because "[i]t is reasonable to provide that the buyer should not be denied the right to assert claims arising out of the sale transaction.  Subsection (a)(3) is based on the belief that it is not reasonable to require the transferee to bear the risk that wholly unrelated claims may be asserted."  *Id.*; *see also Zener v. Velde*, 17 P.3d 296, 300 (Idaho App. 2000).  The McClures claims that Colonial Bank mismanaged its business and committed fraud with respect to its financial condition generally, which might be asserted by any shareholder regardless of whether they received a loan, clearly do not arise out of the loan transaction that gave rise to the Note.  Accordingly, such claims do not seek recoupment against BB&T within the scope of §§ 7-3-305(a)(3) and (b).

Finally, the McClures cite Ala. Code § 7-9A-404 as a basis for these counterclaims.  That section provides:

11

(a) Assignee's rights subject to terms, claims, and defenses; exceptions. Unless an account debtor has made an enforceable agreement not to assert defenses or claims, and subject to subsections (b) through (e), the rights of an assignee are subject to:

    (1) all terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract; and

    (2) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives a notification of the assignment authenticated by the assignor or the assignee.

(b) Account debtor's claim reduces amount owed to assignee. Subject to subsection (c) and except as otherwise provided in subsection (d), the claim of an account debtor against an assignor may be asserted against an assignee under subsection (a) only to reduce the amount the account debtor owes.

(c) Rule for individual under other law. This section is subject to law other than this article which establishes a different rule for an account debtor who is an individual and who incurred the obligation primarily for personal, family, or household purposes.

(d) Omission of required statement in consumer transaction. In a consumer transaction, if a record evidences the account debtor's obligation, if law other than this article requires that the record include a statement to the effect that the account debtor's recovery against an assignee with respect to claims and defenses against the assignor may not exceed amounts paid by the account debtor under the record, and if the record does not include such a statement, the extent to which a claim of an account debtor against the assignor may be asserted against an assignee is determined as if the record included such a statement.

(e) Inapplicability to health-care-insurance receivable. This section does not apply to an assignment of a health-care-insurance receivable.

Ala. Code § 7-9A-404 (1975).

The McClures cannot show that § 7-9A-404 applies in the context of this case. Nor have the McClures cited authority interpreting the statute it or any similar former Alabama law that might demonstrate that it applies here. For its part, BB&T likewise does not expressly dispute the applicability of this section.

Despite the lack of guidance from the parties, the court concludes that § 7-9A-404 does not apply. That "section deals only with the rights and duties of 'account debtors,' as that term is defined in Article 9A of Alabama's version of the Uniform Commercial Code ("UCC"). *See* Ala. Code § 7-9A-404, Official Comment, ¶ 5. This section does not provide "regulation of the rights and duties of other obligors on collateral, such as the maker of a negotiable instrument (governed by Article 3) ... . Article [9A] leaves those rights and duties untouched." Id. "The term ['account debtor'] does not include persons obligated to pay a negotiable instrument." Ala. Code § 7-9A-102(a)(3). One commentator has explained:

> The term "account debtor" is not applied to the person obligated on a promissory note that serves as collateral because some of the rules of Article 9 that deal with rights and duties of account debtors are inappropriate for application to a person obligated to pay a promissory note, at least if the note is a negotiable one, as Article 9 generally defers to Article 3's rules governing the rights and duties of persons obligated on promissory notes.

D. F. Adams, Sales of Personal Property as Secured Transaction Under Article 9 of the Uniform Commercial Code, 31 U. Ark. Little Rock L. Rev. 1, 10 n. 45 (2008). Here, the McClures are the parties obligated on the promissory note to Colonial Bank. As such, they are "debtors" and "makers of a negotiable instrument," but they are not "account debtors" for purposes of § 7-9A-404. Accordingly, that section is inapplicable to the McClures, and BB&T is entitled to a dismissal of the McClures' counterclaims founded upon alleged mismanagement and fraud by Colonial Bank.

## IV.    CONCLUSION

Based on the foregoing, BB&T's motion to dismiss (Doc. 14) the McClures' counterclaims is due to be GRANTED. A separate order will be entered.

13

As to the foregoing it is SO ORDERED this the 4th day of January, 2011.

PAUL W. GREENE
CHIEF MAGISTRATE JUDGE