FILED
2011 Jul-18 PM 03:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

BRANCH BANKING AND TRUST COMPANY,

Plaintiff/Counterclaim Defendant

v. 2:10-cv-0301-PWG

MICHAEL McCLURE and SANDRA McCLURE,

Defendants/Counterclaim Plaintiffs

**MEMORANDUM OPINION**

This is a diversity case in which the plaintiff, Branch Banking and Trust Company ("BB&T"), as successor in interest to the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as receiver for Colonial Bank, seeks to recover under Alabama law on a promissory note made by the defendants, Michael and Sandra McClure (the "McClures"). The parties have consented to the exercise of plenary jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Rule 73, Fed. R. Civ. P. (Doc[1]. 12). The action is now before the court on a motion for summary judgment filed by BB&T. (Doc. 23). The parties have fully briefed the motion, which is now ripe for decision. Upon consideration, the court concludes that BB&T's motion for summary judgment is due to be GRANTED.

**I. REVIEW STANDARDS**

Pursuant to Rule 56, Fed. R. Civ. P., party is authorized to move for summary judgment on all or part of a claim or defense asserted either by or against the movant. Under that rule, the "court

---

[1]References herein to "Doc. __" are to the docket numbers assigned by the Clerk of the Court to the pleadings filed in this matter.

shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ.[2] The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Rule 56(c)(1)(A), (B), Fed. R. Civ. P. Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Accordingly, in its review of the evidence, a court must credit the evidence of the non-movant and draw all justifiable inferences in

---

[2] BB&T seems to suggest that its motion for summary judgment is subject to Alabama state procedural law. (*See* Doc. 23 at 4-5). However, it is clear that, even in diversity cases where state substantive law controls, federal summary judgment procedural standards apply. *See Hutcherson v. Progressive Corp.*, 984 F.2d 1152, 1155 (11th Cir. 1993); *Helmich v. Kennedy*, 796 F.2d 1441, 1443 (11th Cir. 1986).

the non-movant's favor. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000). Where, as here, the moving party has the burden of proof at trial, it must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. *United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc). "In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *Id.*

## II. BACKGROUND[3]

On or about January 24, 2006, the McClures signed a promissory note (the "Note") to Colonial Bank, pursuant to which it loaned the McClures the principal amount of $3.6 million (the "Loan") for the purpose of purchasing a Cessna Citation airplane. (Doc. 23 at 18-21, Affidavit of Douglas F. Elliott, II, dated January 7, 2011 ("Elliott Aff. I"), ¶ 2). In conjunction with the Note, the McClures and Colonial Bank also executed a Term Loan Agreement (the "Loan Agreement") whereby the terms of the Loan were more specifically delineated, as well as a Securities Pledge Agreement (the "Pledge Agreement"), pursuant to which the McClures pledged, among other things, a certain investment account containing certain securities as collateral to secure payment on the Loan. (Elliott Aff. I, ¶¶ 3, 4). On February 8, 2010, BB&T, asserting that it is the current holder of the Note, the Loan Agreement, the Pledge Agreement and the related loan documents (collectively the "Loan Documents"), filed this action alleging that the McClures are liable under Alabama state

[3]The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F. 3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp 2d 1266, 1267 n.1 (N.D. Ala 1998).

law because they defaulted on the Loan. (Doc. 1 ("Complaint" or "Compl.")). BB&T maintains acquired the right to enforce the Note and the other Loan Documents on the basis that is the successor in interest to Colonial Bank pursuant to a Purchase and Assumption Agreement ("P&A Agreement") with the FDIC, which was appointed as the Receiver of Colonial Bank when it failed on August 14, 2009. (Compl. ¶ 1); *see also generally Bank of Amer. Nat. Ass'n v. Colonial Bank*, 604 F.3d 1239, 1240-42 (11th Cir. 2010); *In re Colonial BancGroup, Inc.*, 436 B.R. 713, 716-19 (M.D. Ala. 2010). This court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332.[4]

BB&T has now moved for summary judgment, asserting that the McClures are jointly and severally liable on the Note in the amount of $1,466,614.69[5]; as well as for attorneys' fees, as authorized in the Loan Documents, in the amount of $27,477.30[6]; and for court costs. In response, the McClures do not dispute that they signed the Note and entered into the Loan Agreement with Colonial Bank. Nor do the McClures contest that they have defaulted as alleged. Rather, the sole

[4] Under 28 U.S.C. § 1332(a)(1), this court has jurisdiction to hear civil actions where the matter in controversy exceeds $75,000, exclusive of interest and costs and is between citizens of different states. Both requirements are met here. BB&T is a citizen of North Carolina, *see Branch Banking & Trust Co. v. T. Henry Development Co.*, LLC, 2011 WL 1467747 (N.D. Fla. April 18, 2011), while the McClures are citizens of Alabama. BB&T has asserted that, at the time the complaint was filed, the McClures were jointly and severally liable to pay almost $1.3 million on the Note.

[5] BB&T asserts that the total amount due under the Note, exclusive of attorney's fees, is based on outstanding principal of $1,248,657.08; interest in the amount of $164,772.61; late fees in the amount of $1,700.00, with interest accruing at the default rate of 8.9%, or $294.20 per day. As of January 24, 2011, that total was $1,415,129.69. (Elliott Aff. I, ¶ 11). Since that date, an additional 175 days have elapsed at $294.20 per day, bringing the total to $1,466,614.69.

[6] In support of its claim for attorney's fees and the reasonableness of the amount thereof, BB&T has filed an affidavit of its counsel, Clifton C. Mosteller. (*See* Doc. 23, at 57-60, Affidavit of Attorney in Support of Motion for Summary Judgment).

argument that the McClures raise at this point in the proceedings[7] is that BB&T has not carried its burden as the movant for summary judgment to show that BB&T is a party entitled to enforce the Loan Documents.

## III. DISCUSSION

In arguing that BB&T is not entitled to summary judgment, the McClures emphasize that the Loan Documents memorialize an agreement only between themselves and Colonial Bank, not BB&T. The McClures recognize that BB&T claims that its rights were obtained not directly from Colonial Bank but rather from a transfer from the FDIC, acting as receiver. The McClures have not offered any evidence or argument in an attempt to *negate* BB&T's assertion that it acquired such rights. Rather, the McClures argue more modestly that BB&T has not carried its burden as the movant for summary judgment to present sufficient proof establishing its right of enforcement because the record, the McClures contend, is simply unclear regarding exactly what assets of Colonial Bank might have been transferred first to the FDIC and then to BB&T. To this end, the McClures argue in their brief:

> This series of transfers was surely commemorated in a set of very sophisticated agreements between Colonial Bank, the FDIC and BB&T. There are no documents in the record to explain what happened. All we have are what amounts to conclusory statements made for the most part by the lawyers for BB&T.
>
> * * *
>
> We have no documentary proof of the assignment, nor do we have anything to demonstrate what conditions or limitations may have been a part of such assignment. The best evidence of whether the assignment of the [Loan] Agreement took place is

---

[7] The McClures initially asserted several counterclaims against BB&T based on alleged wrongdoing by Colonial Bank, contending that any recovery on such counterclaims would offset amounts the McClures owed on the Loan. However, the court has previously dismissed those counterclaims. (Docs. 21, 22).

> the actual instrument or instruments effecting the alleged assignment. (FRE Rule (sic) 1002).

(Doc. 25 at 4-5).

The McClures are correct that BB&T is not entitled to summary judgment absent a sufficient showing to allow a finding that it is a party authorized to enforce the Note. *See Cadle Co. v. Friedman*, 631 So. 2d 962, 964-65 (Ala. 1994) (affirming trial court judgment that plaintiff company was not entitled to enforce a note because company failed to prove that note was among assets it had purchased from FDIC); *FDIC v. Houde*, 90 F.3d 600, 604 (1st Cir. 1996) (FDIC failed to show that it was entitled to sue on a particular promissory note previously held by failed bank). The McClures are also correct that BB&T has not offered copies of any agreements, instruments, or other documents evidencing the FDIC's appointment as receiver or BB&T's purchase of either the particular Note here at issue or even of Colonial Bank's assets more broadly. Nonetheless, BB&T has asked the court to take judicial notice of the P&A Agreement between the FDIC and BB&T in order to establish its ownership of, and right to enforce, the Loan Documents. (Doc. 23 ¶ 1 n.1; Doc. 26 at 2-3 n.2). That agreement, as well as other information related to Colonial Bank's failure and the FDIC's appointment as its receiver, are publicly available on the FDIC's official website, *see* http://www.fdic.gov/bank/individual/failed/colonial-al_P_and_A.pdf (the "P&A Agreement), http://www.FDIC.gov/bank/individual/failed/colonial-al.html ("Colonial Bank FDIC Failed Bank Information"). The McClures have not contested BB&T's request that the court take judicial notice of such materials, and the court concludes that it is appropriate to do so, as the FDIC website is a source whose accuracy cannot reasonably be questioned in this context. *See* Fed. R. Evid. 201; *Lazarre v. JPMorgan Chase Bank, N.A.*, ___ F. Supp. 2d ___, ___ n. 12, 2011 WL 1438432, *8 n.

12 (S.D. Fla. April 14, 2011); *Southwest Ga. Fin. Corp. v. Colonial Amer. Cas. & Sur. Co.*, 2009 WL 1410272, *1 (M.D. Ga. May 19, 2009); *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002); *Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 959 (N.D. Cal. 2010); *McCann v. Quality Loan Serv. Corp.*, 729 F. Supp. 2d 1238, 1241 (W.D. Wash. 2010).

According to those materials on the FDIC website, Colonial Bank was closed on August 14, 2009, by the Alabama State Banking Department, and the FDIC was named receiver. (Colonial Bank FDIC Failed Bank Information § I; P&A Agreement at 1). Under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), when the FDIC is appointed receiver, *see* 12 U.S.C. § 1821(c), it succeeds to "all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder ... of such institution with respect to the institution and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A)(i). This language indicates that the FDIC as receiver "steps into the shoes" of the failed bank, obtaining the rights "of the insured depository institution" that existed prior to receivership. *O'Melveny v. Myers v. FDIC*, 512 U.S. 79, 86 (1994). Because it has been shown that FDIC became the receiver for Colonial Bank, it has been sufficiently established that Colonial Bank's rights in the Note were transferred by operation law to the FDIC. *See Houde*, 90 F.3d at 606; *FDIC v. Patel*, 46 F.3d 482, 485 (5th Cir. 1995).

The FDIC website further indicates that, pursuant to its authority as a receiver under FIRREA[8], the FDIC entered into a P&A Agreement on August 14, 2009, whereby BB&T purchased

[8] The FDIC has statutory authority to sell and dispose of receivership assets, including loans and loan proceeds. *See Bank of Amer.*, 604 F.3d at 1243. For example, the FDIC may take over of the assets of the bank, conduct all business, and collect all obligations and money due the bank. 12 U.S.C. § 1821(d)(2)(B)(i), (ii). The FDIC may also "place the insured depository institution in liquidation and proceed to realize upon the assets of the institution ...,"

certain assets and assumed certain liabilities of Colonial Bank[9] (P&A Agreement at cover page). In its motion for summary judgment, BB&T contends that the P&A Agreement itself shows that BB&T acquired rights in the Note and the other Loan Documents as part of a broader purchase of assets from the FDIC. (Doc. 23, ¶ 1 & n.1). Section 3.1 of the P&A Agreement describes the assets purchased by BB&T in relevant part as follows:

> With the exception of certain assets expressly excluded in Sections 3.5 and 3.6, [BB&T] hereby purchases from the [FDIC], and the [FDIC] hereby sells, assigns, transfers, conveys, and delivers to [BB&T], all right, title, and interest of the [FDIC] in and to all of the assets (real, personal and mixed, wherever located and however acquired) including all subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated, of [Colonial Bank] whether or not reflected on the books of [Colonial Bank] as of [its closing].

---

including the "transfer [of] any asset or liability of the institution in default ... without any approval, assignment, or consent with respect to such transfer." 12 U.S.C. § 1821(d)(2)(E), (G)(i)(II).

[9] The Eleventh Circuit has summarized the nature of a purchase and assumption agreement transaction thus:

> When a bank fails, the FDIC acts simultaneously in two capacities: the receiver capacity ("FDIC-Receiver") and the corporate capacity ("FDIC-Corporate"). The corporate capacity of the FDIC refers to its role as the insurer of bank deposits. Rather than liquidating a bank when it fails, the FDIC whenever feasible employs a purchase and assumption transaction. In a purchase and assumption transaction, the FDIC-Receiver sells the failed bank as a going concern to a financially sound bank, in return for the purchasing bank's promise to assume all the failed bank's deposit liabilities. Unacceptable assets remain with the FDIC-Receiver. FDIC-Corporate then purchases the unacceptable assets with insurance funds, and attempts to collect on the unacceptable assets to minimize the FDIC's losses.

*Motorcity of Jacksonville, Ltd. v. Southeast Bank N.A.*, 83 F.3d 1317, 1324 n. 6 (11th Cir. 1996) (en banc), cert. granted, judgment vacated *sub nom Hess v. FDIC*, 519 U.S. 1087 (1997), opinion reinstated on remand, 120 F.3d 1140 (11th Cir. 1997); *see also Gunter v. Hutcheson*, 674 F.2d 862, 865-66 (11th Cir. 1982); *FDIC v. Jenkins*, 888 F.2d 1537, 1539-40 (11th Cir. 1989).

Neither of the above cross-referenced Sections of the P&A Agreement, 3.5[10] and 3.6[11], appear on

---

[10]Section 3.5 of the P&A Agreement provides:

> **Assets Not Purchased by Assuming Bank**. [BB&T] does not purchase, acquire or assume, or (except as otherwise expressly provided in this Agreement) obtain an option to purchase, acquire or assume under this Agreement:
>
> (a) any financial institution bonds, banker's blanket bonds, or public liability, fire, or extended coverage insurance policy or any other insurance policy of [Colonial Bank], or premium refund, unearned premium derived from cancellation, or any proceeds payable with respect to any of the foregoing;
>
> (b) any interest, right, action, claim, or judgment against (i) any officer, director, employee, accountant, attorney, or any other Person employed or retained by the [Colonial Bank] or any Subsidiary of [Colonial Bank] on or prior to Bank Closing arising out of any act or omission of such Person in such capacity, (ii) any underwriter of financial institution bonds, banker's blanket bonds or any other insurance policy of [Colonial Bank], (iii) any shareholder or holding company of [Colonial Bank], or (iv) any other Person whose action or inaction may be related toany loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by [Colonial Bank]) incurred by the [Colonial Bank]; provided, that for the purposes hereof, the acts,omissions or other events giving rise to any such claim shall have occurred on or before Bank Closing, regardless of when any such claim is discovered and regardless of whether any such claim is made with respect to a financial institution bond, banker's blanket bond, or any other insurance policy of [Colonial Bank] in force as of Bank Closing;
>
> (c) prepaid regulatory assessments of the [Colonial Bank], if any;
>
> (d) legal or equitable interests in tax receivables of [Colonial Bank], if any, including any claims arising as a result of [Colonial Bank] having entered into any agreement or otherwise being joined with another Person with respect to the filing of tax returns or the payment of taxes;
>
> (e) amounts reflected on the Accounting Records of [Colonial Bank] as of Bank Closing as a general or specific loss reserve or contingency account, if any;
>
> (f) leased or owned Bank Premises and leased or owned Furniture and Equipment and Fixtures and data processing equipment (including hardware and software) located on leased or owned Bank Premises, if any; provided, that the Assuming Bank does obtain an option under Section 4.6, Section 4.7 or Section 4.8, as the case may be, with respect thereto;

---

(g) owned Bank Premises which the [FDIC], in its discretion, determines may contain environmentally hazardous substances;

(h) any "goodwill," as such term is defined in the instructions to the report of condition prepared by banks examined by the Corporation in accordance with 12 C.F.R. Section 304.4, and other intangibles;

(i) any criminal restitution or forfeiture orders issued in favor of [Colonial Bank];

(j) reserved;

(k)assets essential to the [FDIC] in accordance with Section 3.6;

[(l) reserved;]

(m) any other asset, contract, agreement, arrangement, understanding, relationship,activity or association which, in the determination of the [FDIC] may be tainted with fraud, criminality, or otherwise determined to be improper;

(n) any asset, loan or security associated with TBW, or Taylor, Bean, Whitaker Mortgage Corporation, Ocala, Florida, or any Affiliate thereof.

[11] Section 3.6 of the P&A Agreement provides:

**Retention or Repurchase of Assets Essential to [the FDIC].**

(a) The [FDIC] may refuse to sell to [BB&T], or [BB&T] agrees, at the request of the [FDIC] set forth in a written notice to [BB&T], to assign, transfer, convey, and deliver to the [FDIC] all of [BB&T's] right, title and interest in and to, any Asset or asset acquired pursuant to this Agreement essential to the [FDIC] as determined by the [FDIC] in its discretion (together with all Credit Documents evidencing or pertaining thereto), which may include any Asset or asset that the [FDIC] determines to be:

> (i) made to an officer, director, or other Person engaging in the affairs of [Colonial Bank], its Subsidiaries or Affiliates or any related entities of any of the foregoing;
>
> (ii) the subject of any investigation relating to any claim with respect to any item described in Section 3.5(a) or (b), or the subject of, or potentially the subject of, any legal proceedings;

their face to exclude the Note or the other Loan Documents from the assets purchased by BB&T. Accordingly, the court concludes that the broad language of Section 3.1 of the P&A Agreement describing the assets purchased by BB&T sufficiently indicates that BB&T purchased the Note and the other Loan Documents. *See New Bedford Inst. for Sav. v. Calcagni*, 676 A.2d 318, 319 (R.I. 1996); *First Heights Bank, FSB v. Gutierrez*, 852 S.W.2d 596, 616 (Tex. App. - Corpus Christi 1993); *Hinsley v. Bank One, Texas, N.A.*, 1991 WL 94427, *2-4 (Tex. App. - Hous. (1 Dist.) 1991).

The McClures argue, however, that, under governing Alabama state law, the "[a]bsence of an explicit assignment means that BB&T cannot assert their claims in this action." (Dfts. Opp. Brief

---

> (iii) made to a Person who is an Obligor on a loan owned by the [FDIC] or the [FDIC] in its corporate capacity or its capacity as receiver of any institution;
>
> (iv) secured by collateral which also secures any asset owned by the [FDIC]; or
>
> (v) related to any asset of [Colonial Bank] not purchased by [BB&T] under this Article III or any liability of [Colonial Bank] not assumed by [BB&T] under Article II.

(b) Each such Asset or asset purchased by the [FDIC] shall be purchased at a price equal to the Repurchase Price thereof less the Related Liability Amount with respect to any Related Liabilities related to such Asset or asset, in each case determined as of the date of the notice provided by the [FDIC] pursuant to Section 3.6(a). The [FDIC] shall pay [BB&T] not later than the twentieth (20th) Business Day following receipt of related Credit Documents and Credit Files together with interest on such amount at the Settlement Interest Rate for the period from and including the date of receipt of such documents to and including the day preceding the day on which payment is made. [BB&T] agrees to administer and manage each such Asset or asset in accordance with usual and prudent banking standards and business practices until each such Asset or asset is purchased by the [FDIC] All transfers with respect to Asset or assets under this Section 3.6 shall be made as provided in Section 9.6. [BB&T] shall transfer all such Asset or assets and Related Liabilities to the [FDIC] without recourse, and shall indemnify the [FDIC] against any and all claims of any Person claiming by, through or under [BB&T] with respect to any such Asset or asset, as provided in Section 12.4.

at 5). In support of that proposition, the McClures cite one case: *LPP Mortgage, Ltd. v. Boutwell*, 36 So. 3d 497 (Ala. 2009). The court agrees that Alabama state law governs what BB&T must show to enforce the Note or other associated Loan Documents. *See Houde*, 90 F.3d at 604. However, the McClures are wrong that *LPP Mortgage* or Alabama law otherwise requires BB&T to prove an "explicit assignment" in order to enforce the Note, as explained below.

First, the McClures' reliance on *LPP Mortgage* is misplaced. Indeed, the Alabama Supreme Court there *rejected* the same argument now urged by the McClures. In *LPP Mortgage*, a lumber company executed a promissory note to ITT Small Business Finance Corporation ("ITT"), secured by a mortgage. 36 So. 3d at 498. Several individuals associated with the lumber company also executed guaranty agreements, providing that they would pay if the lumber company defaulted on the note. *Id.* ITT later assigned the guaranties to a bank, Farmers Exchange, which, in turn, assigned them to the United States Small Business Administration ("SBA"). *Id.* After the lumber company defaulted on the note and declared bankruptcy, the SBA sold the loan instruments to LPP Mortgage ("LPP"), which sued only on the guaranty agreements. *Id.* at 499. After a bench trial, the court entered a judgment for the defendants, holding, in relevant part, that LPP lacked "privity" to enforce them, because the guaranties showed assignments from ITT to Farmers Exchange and then to the SBA, but "no further assignment, transfer or endorsement" to LPP. *Id.* On appeal, the Alabama Supreme Court noted that the "defendants contend, without citation to legal authority, that the trial court correctly determined that the absence of an explicit assignment of their guaranties means that LPP cannot assert any claims with respect to the guaranties." *Id.* at 501. The Court then proceeded to refute that argument, recognizing instead that under Alabama law

"[t]here are no formal requirements for an assignment, and 'an assignment may be

> written, parol, or otherwise.' *Baker v. Eufaula Concrete Co.*, 557 So. 2d 1228, 1230 (Ala. 1990). The court must look to the substance of the assignment rather than to its form to determine whether there has been an assignment. *See id.* There has been an assignment (1) if the assignor intended to transfer a present interest in the subject matter of the contract, *id.*, and (2) if the assignor and the assignee mutually assented to the assignment. *See* 6A C.J.S. Assignments § 73 (2004). An assignment is construed in accordance with the law of contracts. *Dill v. Blakeney*, 568 So. 2d 774, 778 (Ala. 1990)."

*LPP Mort.*, 36 So. 3d at 501 (quoting *DeVenney v. Hill*, 918 So. 2d 106, 113 (Ala. 2005)). Applying those principles, the Court reversed the judgment below, holding that LPP had established an assignment authorizing its enforcement of the guaranties because (1) they had been physically delivered to LPP along with the underlying note and mortgage and (2) general language in the mortgage assignment was broad enough to demonstrate an intent to assign all associated loan documents, including the guaranties. *Id.* Accordingly, *LPP Mortgage* does not support that BB&T must show an "explicit assignment" of the Note or the other Loan Documents, such as by an indorsement, in order to be entitled to enforce them.

Further, although the parties do not argue the point at summary judgment, there is no serious dispute that the Note is a negotiable instrument subject to Alabama's version of Article 3 of the Uniform Commercial Code. *See* Ala. Code §§ 7-3-102(a), 7-3-104(a) (1975); *McKerall v. Kaiser*, 60 So. 3d 288, 291 (Ala. 2010); (*see also* Doc. 18, "McClure's (sic) Response to Plaintiff's Motion to Dismiss," at 2; Doc. 19, "Reply in Support of the Motion of Branch Banking and Trust Company to Dismiss Defendants' Counterclaim," ¶¶ 10-11; Doc. 21 at 11, 13-14). Pursuant to Ala. Code § 7-3-301, a person entitled to enforce a negotiable instrument includes "(i) the holder of the instrument" and "(ii) a nonholder in possession of the instrument who has the rights of a holder." *See Fidelity and Deposit Co. of Maryland v. Colonial Bancgroup, Inc.*, 2003 WL 23324215, *2

(M.D. Ala. Nov. 20, 2003). With its motion for summary judgment, BB&T offered a copy of the Note into evidence, and BB&T's possession thereof is undisputed. But at least at that time, there was no purported indorsement of the Note to BB&T, which would preclude BB&T from qualifying as a "holder" for purposes of Ala. Code § 7-3-301(i). *See Fidelity and Deposit Co. of Maryland*, at *2 & n.4; *Houde*, 90 F.3d at 604-05; *Citizens Bank v. Cross*, 2005 WL 1249276, *2 (R.I. Super. 2005); *Hinsley v. Bank One, Texas, N.A.*, 1991 WL 94427, *2 (Tex. App. - Hous. (1 Dist.) 1991). Nonetheless, even without indorsements, BB&T could still show that it is entitled to enforce the Note as a nonholder in possession with rights of a holder under Ala. Code § 7-3-301(ii) by (1) producing the Note to establish possession and (2) proving a sufficient transfer from a holder. *See Houde*, 90 F.3d at 606; *Calcagni*, 676 A.2d at 319. The former point is undisputed. On the latter the court likewise concludes, for reasons previously stated, that BB&T has made a sufficient showing based upon the materials on the FDIC website supporting that the FDIC was appointed receiver for Colonial Bank and that BB&T acquired rights in the Note and the associated Loan Documents under the P&A Agreement. Accordingly, BB&T is authorized to bring suit on the Note and the other Loan Documents.

Finally, even assuming for the sake of argument that the McClures are correct that Alabama law requires an "explicit assignment," or that the P&A Agreement does not itself sufficiently prove that BB&T's purchase of assets included the Loan Documents, BB&T is still entitled to prevail on their motion for summary judgment. After the McClures filed their opposition brief noting the lack of an "explicit assignment," BB&T filed evidence with its reply offered to prove that the Note and the other Loan Documents had since been expressly and separately indorsed or otherwise assigned or transferred by the FDIC to BB&T. Specifically, BB&T offers a second affidavit from Douglas

F. Elliot, II (Doc. 26-1 at 2-6 ("Elliot Aff. II"), with exhibits, namely an "Assignment of Loan and Related Loan Documents" (Doc. 26-1 at 8-10) (the "Assignment"), and an "Allonge" (Doc. 26-1 at 12) (the "Allonge"). The Assignment, which "is made and entered into as of March 18, 2011 but made effective as of August 14, 2009," provides that the McClures' Loan and the Associated Loan Documents are assigned by the FDIC, in its capacity as receiver for Colonial Bank, to BB&T for ten dollars consideration. (Assignment ¶¶ 1-2 (emphasis original)). On the Allonge[12], a representative of the FDIC has indorsed the McClures' Note to BB&T, by a signature dated March 11, 2011 but made "effective as of the 14th day of August 2009." (Allonge). Generally speaking, where a movant for summary judgment offers new evidence or arguments in a reply brief, it is appropriate, if asked to do so by the nonmovant, to either strike the new evidence or allow the nonmovant to file a surreply to respond to it. *See General Elec. Capital Corp. v. Emergystat, Inc.*, 2009 WL 4465245, *8 n. 5 (N.D. Ala. Sept. 30, 2009). However, it has been almost four months since BB&T filed its reply materials on March 18, 2011, and the McClures have not moved to strike the new evidence nor sought to file a surreply or otherwise respond. Given that, the court is authorized to consider the materials submitted by BB&T with its reply. *See Clinkscales v. Chevron USA, Inc.*, 831 F.2d 1565, 1568-69 (11th Cir. 1987); *Lightsey v. Potter*, 268 Fed. App'x 849, 852 (11th Cir. 2008). The court concludes that those materials are sufficient to further establish a transfer of rights authorizing BB&T to enforce the Note and the Loan Documents against the McClures.

## III. CONCLUSION

Based on the foregoing, BB&T has established that it is a party entitled to enforce the Loan

---

[12] An allonge is a paper annexed to a negotiable instrument for the purpose of receiving further indorsements. Black's Law Dictionary (9th ed. 2009).

Documents made by the McClures. Accordingly, BB&T's motion for summary judgment (Doc. 23) is due to be GRANTED. A separate final judgment will be entered.

DONE this 18th day of July, 2011.

PAUL W. GREENE
CHIEF MAGISTRATE JUDGE